

FILED

2018 JUN -7 PM 1: 16

CLERK. US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MEYERS DIVISION

CISCO SYSTEMS, INC., a California corporation, and CISCO TECHNOLOGY, INC., a California corporation,

        Plaintiffs,

v.

ABARAM NETWORK SOLUTIONS, INC., a Florida corporation, TJR PROCUREMENT, LLC, a Florida limited liability company, SEFANIT TESFAYE a/k/a STEPHANIE TESFAYE a/k/a STEPHANIE MACDOUGALL, an individual, DAVID JESSE MACDOUGALL, an individual, and DOES 1-50,

        Defendants.

Civil Action No.: 2:18-cv-354-FtM-99MRM

_____/

## FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL

Plaintiffs Cisco Systems, Inc. ("CSI") and Cisco Technology, Inc. ("CTI") (together, "Cisco" or "Plaintiffs"), hereby complain and allege against Defendants Abaram Network Solutions, Inc. ("Abaram"); TJR Procurement, LLC ("TJR"); Sefanit Tesfaye ("Tesfaye") also known as Stephanie Tesfaye and Stephanie MacDougall; David Jesse MacDougall ("MacDougall"); and Does 1-50, inclusive (together, "Defendants') as follows:

### INTRODUCTION

1. This case seeks to stop the mass infringement and counterfeiting, and related unfair competition, arising from Defendants' importation and resale of counterfeit Cisco products. The deliberate and unlawful scheme uncovered by Cisco demonstrates that Defendants have imported large quantities of computer networking equipment bearing counterfeit Cisco

(5-14)

trademarks and sold or offered to sell these counterfeit products to consumers. Cisco brings this lawsuit to stop Defendants' illegal and infringing conduct and to recover for the significant damage it has caused.

## THE PARTIES

2. Plaintiff Cisco Systems, Inc. is, and at all times mentioned herein was, a California corporation, with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134. Plaintiff Cisco Technology, Inc. is, and at all times mentioned herein was, a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134. CTI owns the trademarks used by CSI in marketing Cisco-branded products.

3. Upon information and belief, Defendant Abaram is, and at all relevant times was, a Florida corporation, located at 3894 Mannix Drive, Building 208, Naples, Florida.

4. Upon information and belief, Defendant TJR is, and at all relevant times was, a Florida limited liability company, located at 3049 Cleveland Avenue, Suite 215, Fort Myers, Florida.

5. Upon information and belief, Defendant Tesfaye is, and at all relevant times was, an individual residing in Florida who owns 50 percent of Abaram, is TJR's President, and is intimately involved in operating both Abaram and TJR.

6. Upon information and belief, Defendant MacDougall is, and at all relevant times was, an individual residing in Florida who owns 25 percent of Defendant Abaram, is Abaram's president, and is intimately involved in operating both Abaram and TJR.

7. Cisco is currently unaware of the true names and capacities of Does 1 through 50, inclusive, whether individual, corporate, associate, or otherwise. Due to the surreptitious nature of Defendants' actions, the identities of Does 1 through 50 have been concealed from Cisco,

preventing Cisco from identifying them by name. After discovery, which is necessary to ascertain the true names and capacities of Does 1 through 50, Cisco will amend this Complaint to show the true names and capacities of these Doe defendants and allege the necessary identifying details.

8. Cisco is informed and believes, and thereon alleges, that each of the defendants designated herein as a Doe is legally responsible, in some manner, for the events and happenings herein referred to, and legally caused damages to Cisco as herein alleged.

9. At all times relevant to this action, each defendant, including those fictitiously named defendants, was the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, or co-conspirator of the other defendants and was acting within the scope of that agency, service, employment, partnership, joint venture, representation, affiliation, or conspiracy, and each is legally responsible for the acts and omissions of the others.

## JURISDICTION AND VENUE

10. This is an Action for violations of the Trademark Act of 1946, 15 U.S.C. §§ 1051 et seq. (the "Lanham Act"). This Court has original subject matter jurisdiction over this Action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a) and (b).

11. This Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367, because these claims are so related to Cisco's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

12. This Court has personal jurisdiction over Defendants, whose principal place of business or residence is located in this district, and who have engaged in business activities in this district, misled consumers in this district, directed business activities at this district, and

committed tortious acts with knowledge that the effects of their acts would be felt by Cisco in this district.

13.     Venue is proper in this district, pursuant to 28 U.S.C. § 1400(a). Venue is also proper in this district, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Cisco's claims occurred in this judicial district, and a substantial part of the property that is the subject of the action is situated in this district.

## FACTUAL ALLEGATIONS

### A.     Cisco's Business And History

14.     Cisco was founded in 1984 and is the worldwide leader in developing, implementing, and providing the technologies behind networking, communications, and information technology products and services. Cisco develops and provides a broad range of networking products and services that enable seamless communication among individuals, businesses, public institutions, government agencies, and service providers. Specifically, the thousands of engineers who work at Cisco develop and provide networking and communications hardware, software, and services that utilize cutting-edge technologies to transport data, voice, and video within buildings, across cities and campuses, and around the world.

15.     Since its founding, Cisco has pioneered many of the important technologies that created and enabled global interconnectivity. During the past three decades, Cisco has invested billions of dollars, and the time and dedication of thousands of its engineers, in the research, development, and sale of industry leading networking and communications products and services.

16.     Cisco has also built up tremendous goodwill and brand reputation among consumers, including corporate and government consumers, through significant investment in

advertising, promoting, and delivering products, software, and services of the highest quality under Cisco's CISCO trademark and trade name and the family of CISCO-related trademarks (the "CISCO Marks"). Cisco has used the family of CISCO Marks to identify goods and services as being genuine and authorized, and therefore, the CISCO Marks are well-recognized signifiers of Cisco's best-in-class products, software, and services.

### B.  Cisco's Trademarks

17. CTI owns all rights, title, and interest in the CISCO Marks, which are included on the Principal Register of the U.S. Patent and Trademark Office. The CISCO Marks are well-known. They are used in connection with Cisco's networking hardware and software products and services. They include, but are not limited to, the following marks that are used in interstate commerce:

| Mark | Registration Number | Registration Date |
|---|---|---|
| CISCO | 1,542,339 | June 6, 1989 |
| CISCO SYSTEMS | 1,996,957 | August 27, 1996 |
| CISCO | 2,498,746 | October 16, 2001 |
| ılıılı cisco | 3,759,451 | March 9, 2010 |
| CISCO | 3,978,294 | June 14, 2011 |
| ılıılı cisco | 4,263,591 | December 25, 2012 |

18. The CISCO Marks are distinctive, having no meaning outside of their use by Cisco in its course of business operations and in its advertising to distinguish its products and services. Cisco uses the CISCO Marks to advertise through a wide variety of media including

television, radio, newspapers, magazines, billboards, direct mail, and web sites.

19. Cisco has attained one of the highest levels of brand recognition among consumers due to its extensive advertising and promotional efforts and its continuous use of its core CISCO Marks for the past three decades. As a result of Cisco's longstanding and widespread use and promotion of the CISCO Marks, Cisco customers around the globe have come to rely upon the CISCO Marks to identify Cisco's high-quality hardware, software, and services.

20. Cisco's customers associate Cisco's famous and well-known CISCO Marks exclusively with Cisco and Cisco's products and services. When consumers encounter these marks and decide to purchase goods and services identified by these marks, they expect to receive genuine Cisco products that have been produced by Cisco and meet Cisco's rigorous quality control standards.

C. **Counterfeit "Cisco" Products**

21. Counterfeit products that bear markings similar to the CISCO Marks provide customers with a false assurance that the products they have purchased (1) are reliable and conform with Cisco's high standards, (2) come with applicable warranties, (3) can be placed under a Cisco service support contract (i.e., SMARTnet) without payment of extra relicensing or inspection fees, and (4) have been produced in accordance with Cisco's quality assurance standards.

22. In addition to harming Cisco's customers, the sale of counterfeit Cisco products also harms Cisco in many ways. Among these, counterfeit Cisco products which fail or degrade create the false impression that Cisco products are unreliable, thereby improperly tarnishing Cisco's reputation and causing Cisco to suffer lost sales and future business opportunities. When

customers purchase Cisco-branded parts that are counterfeit and unreliable, their image of Cisco is diminished and Cisco's opportunity to sell genuine, high-quality products to those customers may be lost forever. As a result, Cisco suffers substantial and irreparable harm to its brand, image, business, and goodwill with the public. Cisco also suffers lost sales when customers purchase counterfeit products instead of genuine Cisco products.

### D.   Impact on Health, Safety, and National Security Caused By Counterfeit Cisco Products

23.   Cisco products are part of the backbone of the United States information network. Many of Cisco's products are purchased by U.S. governmental entities, the military, hospitals, and by other industries, and used in important and life-essential applications. Critical governmental and other infrastructure is built on, and relies upon, Cisco products to maintain the security of data storage and transfer.

24.   The importance of critical functions being able to rely upon the quality of Cisco products cannot be overstated. Cisco firewalls, for example, ensure the integrity of government, medical, and business data and communications. Many critical government functions rely upon the performance of high-quality Cisco products, as compared to the dangers posed by lower quality counterfeits. For example, in a criminal trial involving counterfeit Cisco products sold to the U.S. Marines, a Marine (Staff Sargent Lee Chieffalo) stated that he specifically demanded genuine Cisco products when he ordered them, because if the networks that the "Cisco" products were in failed due to substandard counterfeit products, "Marines could die."

### E.   Cisco's Sales and Distribution Channels

25.   Cisco is one of the United States' largest and most innovative companies. The volume of Cisco's yearly sales revenue of hardware, software, and related services is

approximately $50 billion dollars world-wide. In order to support this global market, for the great majority of its sales, Cisco relies upon a system of independent distributors and resellers located throughout the world. This system is commonly used in the IT hardware and networking industry. These independent distributors and resellers, referred to as "Authorized Channel Partners" or "Authorized Resellers," typically represent several other equipment manufacturers, in addition to Cisco. Among other things, Cisco's distribution system allows it to maintain expertise and a local presence in regions of the world where there would not otherwise be sufficient business to support it.

26. Authorized Resellers are required to enter into contractual relationships with Cisco that allow them to purchase Cisco products and services at a partner discount from Cisco's authorized distributors. The most common contractual relationship is called an Indirect Channel Partnership Agreement ("ICPA"). This agreement requires Authorized Resellers to purchase Cisco products and services only from Cisco or authorized distributors and to sell those products and services only to end customers for their internal use ("End Users").

27. Cisco's Authorized Resellers are the direct interface with the customers who use Cisco's products and services. Cisco's Authorized Resellers identify sales opportunities, provide technical assistance in selecting products, recommend solutions to address their customers' unique needs, conduct pre-sales and sales support, supply the needed products, and providing post-sales support for the products.

28. Cisco sells products to its authorized Distributors at set prices, which can also be expressed as a "discount" from Cisco's Global List Price for the products. Those Distributors are permitted to sell those products to Authorized Resellers, at price which are negotiated between the Partner and Distributor, but which anticipate that the distributer will sell the products to the Cisco Authorized Reseller for a "standard discount" of the Global List Price. Partners can typically purchase Cisco products at about 35-38% off of the Global List Price. In other words, a $1,000 list price product would cost a Partner between $620-$650.

### F. Defendants' Wrongful Conduct

29. Defendants, without the consent of Cisco, imported, sold, offered for sale, distributed, transported, or assisted in or caused the importation, sale, offer for sale, distribution, or transportation in interstate commerce of products bearing unauthorized reproductions, copies, counterfeits and colorable imitations of the CISCO Marks (the "Infringing Products") and continue to do so.

30. On information and belief, Abaram's primary business is the sale of counterfeit CISCO products.

31. On information and belief, Tesfaye and MacDougall (who are stepmother and stepson) own 50 and 25 percent of Abaram, respectively and both Tesfaye and MacDougall are actively involved in the day-to-day management and operations of Abaram.

32. On information and belief, Tesfaye, MacDougall, and/or Abaram purchased TJR in or around 2014 as a means to bid on government contracts because TJR is in a historically underutilized business zone company (a "HUBZone company") and therefore receives preferential access to procurement opportunities with the federal government.

33. On information and belief, Tesfaye and MacDougall control Abaram and TJR, Abaram and TJR are the alter egos for Tesfaye and MacDougall, and Tesfaye and MacDougall knowingly and intentionally used Abaram and TJR to commit the unlawful actions alleged herein.

34. On information and belief, Abaram purchases a large amount of its Infringing Products from a company called Hong Kong Sellsi, a known seller of counterfeit products. On information and belief, Abaram knows or should know that products purchased from Hong Kong Sellsi were not authentic Cisco products, including because Hong Kong Sellsi made

representations that it sold counterfeit "Cisco" transceivers (e.g., by asking if Abaram wished to purchase "Cisco labeled" or "Cisco original" products) and because Hong Kong Sellsi sold its "Cisco" products at such low prices—typically 80 to 90 percent off list price—as to be a "red flag" that the products were not genuine. On information and belief, MacDougall was informed, at least on one occasion, by an Abaram employee that Hong Kong Sellsi sold counterfeit Cisco products and Abaram nevertheless continued to purchase "Cisco" products from Hong Kong Sellsi.

35. Between August 2016 and February 2017, U.S. Customs and Border Protection ("CBP") seized products bearing counterfeit CISCO Marks being imported by Abaram on five separate occasions.

36. A list of the seizures is below:

| Seizure Notice # | Date of Import | Description | Importer | Exporter |
|---|---|---|---|---|
| 2016-4197-10350001 | 8/2/2016 | "Cisco switch" | Abaram Network Solutions<br>3894 Mannix Drive, Bld 208<br>Naples, FL 34114 | Forward Digital System<br>5B15 Zhongding Building, Beijing, China |
| 2016-4197-103523-01 | 8/3/2016 | "Cisco WS-C3750G-48TS-E Switches" | Abaram Network Solutions<br>3894 Mannix Drive, #208<br>Naples, FL 34114 | Susan Sun<br>6/F Ho King Commercial Centre, Mongkok, Hong Kong |
| 2017-3195-000-113-01 | 1/17/2017 | "network chassis" | Abaram Network Solutions<br>3894 Mannix Drive, Bld 208<br>Naples, FL 34114 | Tracy Lee<br>Flat Rm T78 G/F Bonham Strand West, Shung Wan HK<br>Hong Kong |
| 2017-3195-000-100-01 | 1/17/2017 | "Cisco Network Chassis" | Abaram Network Solutions<br>3894 Mannix Drive, Bld 208<br>Naples, FL 34114 | Helen He<br>Flat Rm T78 FG 18 Bonham Stan She<br>HK Hong Kong |

| | | | | |
|---|---|---|---|---|
| 2017-3195-000-107-01 | 1/17/2017 | "network chassis" | Abaram Network Solutions 3894 Mannix Drive, Bld 208 Naples, FL 34114 | Mary Sun Flat Rm T78 G/F Bonham Strand West Shung Wan HK Hong Kong |

37. On information and belief, after CBP began stopping and seizing Infringing Products bound for Abaram, Abaram began shipping the products to TJR in Fort Meyers in an attempt to evade CBP. Once the products were received at the TJR facility in Fort Myers, they were placed on a separate truck and brought down to Abaram's facility in Naples. On information and belief, the sole reason for creating this complicated shipping scheme was to deceive CBP so that whatever targeting was in place with regard to Abaram in Naples would be thwarted by importing the same counterfeit products to an address over 40 miles away in Fort Myers.

38. The Hong Kong address supplied on the shipping documents related to CBP Seizure Notice No. 2016-4197-103523-01 above is false. Cisco has visited that building in Hong Kong, and the entity is not present at that address. Cisco asserts, on information and belief, that the shipper used a false address in an attempt to evade scrutiny by CBP because the products it shipped to Abaram were counterfeit.

39. On information and belief, Abaram continued to import hundreds of thousands of dollars' worth of "Cisco" products from Hong Kong Sellsi every month until at least December 2017. It is believed, and on information and belief asserted, that Abaram has continued to purchase counterfeit "Cisco" products in 2018, to present, as an on-going business that is primarily selling Cisco products.

40. On information and belief, Abaram has successfully imported Infringing Products that were not seized by CBP because CBP inspects only a small portion of all shipments coming

into the United States. Though Abaram knows or should know that the Infringing Products are not authentic, Abaram nevertheless knowingly sells these products to customers in the United States, who are unaware that they are purchasing counterfeit products.

41. On information and belief, Abaram sells all or virtually all of its counterfeit Cisco products to authorized Cisco channel partners. These authorized partners then sell the counterfeit products to Cisco customers, which have been harmed because they placed their orders to authorized partners to receive certain benefits, including confidence that the products they receive are genuine. Cisco has been harmed when Abaram induced Cisco's authorized channel partners to breach their obligations to Cisco, and purchase products from them. The harm to Cisco and to Cisco's customers is made clear here because some if not all of the products that Abaram sold to the authorized channel partners were counterfeit.

42. Cisco has been, and continues to be, harmed by Defendants' unlawful actions.

## FIRST CLAIM FOR RELIEF

### Federal Trademark Infringement and Counterfeiting

### (15 U.S.C. § 1114(1))

43. Cisco incorporates by reference paragraphs 1-24 and 29-42 of this Complaint as though fully set forth here.

44. Cisco owns all rights, title, and interest in and to the CISCO Marks.

45. The CISCO Marks and the goodwill of the business associated with them are tremendously valuable in the United States and worldwide because they are distinctive and universally associated in the public perception with the highest quality network and communications technology products and services.

46. Defendants have continually attempted to import Infringing Products. Defendants

have on at least five separate occasions attempted to import products bearing counterfeit Cisco Marks. Defendants intended to sell these products in interstate commerce and would have done so absent CBP's seizure of such products. Such sales, if completed, would have directly competed with authorized sales of authentic Cisco products. Upon information and belief, Defendants have successfully imported Infringing Products that were not interdicted by CBP because CBP inspects only a small portion of all shipments coming into the United States.

47. Defendants have sold, offered to sell, distributed, and advertised Infringing Products and continues to do so in violation of Cisco's rights.

48. Defendants' importation and sale of such products was done without Cisco's authorization or consent to use the CISCO Marks but with full knowledge of Cisco's prior rights in those marks.

49. The difference between Defendants' Infringing Products and a genuine Cisco product is material. On information and belief, having all authentic Cisco components and entitlement to warranty services is relevant to consumers' decision about whether, and from whom, to purchase Cisco products.

50. Defendants' actions have caused, and are likely to continue to cause, confusion, mistake, and deception as to the origin and quality of Defendants' Infringing Products because they are intentionally calculated to mislead the general purchasing public into believing that Defendants' Infringing Products originated from, are associated with, or are otherwise authorized by Cisco.

51. Upon information and belief, Defendants' actions were committed fraudulently, willfully, and in bad faith, with knowledge of Cisco's exclusive rights to and goodwill in the CISCO Marks, or with willful blindness to the same, and with the intent to cause confusion, to

cause mistake and/or to deceive.

52. Defendants' unauthorized use of the CISCO Marks constitutes trademark infringement of the federally registered CISCO Marks and has caused substantial damage to Cisco and to the reputation and goodwill symbolized by the CISCO Marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

53. Defendants' conduct has directly and proximately caused and, unless enjoined will continue to cause, substantial, irreparable injury to Cisco and to the business and goodwill represented by the CISCO Marks, leaving Cisco without an adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### False Designation of Origin

### (15 U.S.C. § 1125(a))

54. Cisco incorporates by reference paragraphs 1-24 and 29-42 of this Complaint as though fully set forth here.

55. Defendants have affixed counterfeit or infringing versions or reproductions of the CISCO Marks to unauthorized products and/or product packaging. This unauthorized use of the CISCO Marks is likely to cause confusion, deceive, and mislead the consuming public into believing that there is some affiliation, connection, or association between Defendants and Cisco and is likely to cause confusion, mistake, or deception as to the origin, source, sponsorship, authorization, approval, or affiliation of the Infringing Products.

56. Defendants' actions, including the unauthorized use of the CISCO Marks in commerce, constitute false designation of origin, false, or misleading descriptions of fact, and false or misleading representations of fact, which have caused, and are likely to continue to cause, confusion, mistake, and deception, as to Defendants' association or affiliation with Cisco,

as well as to the origin, source, and sponsorship of the Infringing Products, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

57. Defendants' unauthorized and misleading use of the CISCO Marks constitute willful infringement of the CISCO Marks in violation of 15 U.S.C. § 1114(1)(b) and entitle Cisco to treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and (c).

58. Defendants' actions described above, including its unauthorized and misleading use of the CISCO Marks in commerce have caused, and unless enjoined, will continue to cause, substantial and irreparable injury to Cisco and to the business and goodwill represented by the CISCO Marks, thereby leaving Cisco without an adequate remedy at law.

### THIRD CAUSE OF ACTION

**Florida Deceptive and Unfair Business Practices**

**(Fla. Stat. § 501.201, et seq.)**

59. Cisco incorporates by reference paragraphs 1-42 of this Complaint as though fully set forth here.

60. The foregoing acts of Defendants constitute unfair methods of competition, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Florida Statutes § 501.201, et seq.

61. Upon information and belief, Defendants have made and will continue to make substantial profits and gains to which it is not in law or equity entitled.

62. The foregoing acts of Defendants that constituted unfair methods of competition, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of Florida Statutes § 501.201, et seq. directly and proximately caused actual damage to Cisco's business reputation, brand, and good will, Cisco to suffer lost profits, and Cisco to incur costs in

attempting to prevent Defendants' actions.

63. Cisco is aggrieved and has suffered actual damages as a result of Defendants' unfair methods of competition, and unfair or deceptive acts or practices in the conduct of trade or commerce.

64. Defendants are liable to Cisco for all damages, whether direct or indirect, including all actual damages suffered by Cisco, for the misappropriation of the CISCO Marks and Cisco's name, brand, trademark, reputation, and goodwill, with such damages subject to trebling.

65. Upon information and belief, Defendants intend to continue its infringing acts unless restrained by this Court.

66. Defendants' actions have caused, and unless enjoined will continue to cause, substantial and irreparable injury to Cisco, the CISCO Marks, and to the business and goodwill represented by the CISCO Marks such that Cisco has no adequate remedy at law.

67. Defendants' actions, as described above, have caused financial injury to Cisco for which it is entitled to recover actual damages in an amount to be determined at trial, including reasonable attorneys' fees and costs incurred to bring this action pursuant to § 501.211(2), Fla. Stat. (2017).

68. Cisco is entitled to recover its reasonable attorneys' fees pursuant to § 501.2105, Fla. Stat. (2017).

### FOURTH CLAIM FOR RELIEF
### Tortious Interference with a Contractual Relationship

69. Cisco incorporates by reference paragraphs 1-16, 25-28, and 41-42 of this Complaint as though fully set forth here.

70. Under the terms of Cisco's ICPA, Cisco's Authorized Resellers are contractually

required to purchase Cisco products only from Cisco or Cisco's Authorized Distributors. On information and belief, Defendants have knowledge of this contractual obligation.

71. Cisco is informed and believes, and on that basis alleges, that Defendants have intentionally caused Cisco's Authorized Resellers to breach their contracts with Cisco, without justification or privilege to do so, including the ICPA, by causing Cisco's Authorized Resellers to purchase Cisco products from them, rather than to End Users.

72. As a direct and proximate result of Defendants' intentional inducements of breaches of the ICPA identified herein, Cisco has suffered and will continue to suffer direct, consequential and other damages, including but not limited to, out-of-pocket expenses related to services provided on unauthorized Cisco products, in an amount to be determined at trial in excess of $75,000.

## PRAYER FOR RELIEF

WHEREFORE Cisco respectfully prays for the following relief:

A. For entry of judgment in favor of Cisco and against Defendants on each of Cisco's claims for relief alleged in this Complaint;

B. For a preliminary and permanent injunction restraining Defendants; their officers, agents, servants, employees, attorneys, and affiliated companies; assigns and successors in interest; and those persons in active concert or participation with them, from:

(i) importing, exporting, assisting in the importation or exportation, manufacturing, procuring, distributing, shipping, retailing, selling, offering for sale, marketing, advertising, or trafficking in any products not authorized by Cisco and bearing unauthorized simulations, reproductions, counterfeits, copies, or colorable imitations of the CISCO Marks which are likely to cause confusion, or bearing a design that is of a substantially similar appearance to the CISCO Marks listed in this Complaint;

(ii) From passing off, inducing, or enabling others to sell or pass off as authentic products produced by Cisco or otherwise authorized by Cisco, any product not manufactured by Cisco or produced under the control or supervision of Cisco and approved by Cisco, which uses any of the CISCO Marks listed in this Complaint; and

(iii) From committing any act calculated to cause purchasers to believe that products from Defendants are those sold under the control and supervision of Cisco, or are sponsored, approved, or guaranteed by Cisco, or are connected with and produced under the control or supervision of Cisco;

C. For a determination that Defendants' acts of trademark infringement constitute cases of willful and exceptional infringement;

D. For actual damages as a result of Defendants' unlawful conduct, alleged above, as well as any profits that are attributable to the alleged conduct and are not taken into account in computing Cisco's actual damages;

E. For maximum statutory damages available under the law to the extent Cisco elects statutory damages for any claim for relief;

F. For punitive damages to the fullest extent available under the law;

G. For reasonable attorneys' fees to the fullest extent available under the law;

H. For treble and/or enhanced damages to the fullest extent available under the law;

I. For prejudgment interest and the costs of prosecuting these claims to the fullest extent available under the law;

J. For any additional injunctive, specific performance, and/or other provisional remedies, as appropriate; and,

K.    For such other and further relief as the Court deems just and proper.

Dated: June 7, 2018

Respectfully submitted,

*/s/ Richard S. Dellinger*

Richard S. Dellinger, Esquire
Trial Counsel for Plaintiffs
Florida Bar No.: 179957
LOWNDES, DROSDICK, DOSTER,
   KANTOR & REED, P.A.
215 North Eola Drive
Orlando, Florida 32801
Telephone: (407) 843-4600
Facsimile (407) 843-4444
richard.dellinger@lowndes-law.com
tina.althoff@lowndes-law.com
litcontrol@lowndes-law.com

and

Richard J. Nelson, Esquire
*To be Admitted Pro Hac Vice*
California Bar No.: 141658
Anna P. Chang, Esquire
*To be Admitted Pro Hac Vice*
California Bar No.: 301468
SIDEMAN & BANCROFT, LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, California 94111-3711
Telephone: (415) 392-1960
Facsimile: (415) 392-0827
rnelson@sideman.com
achang@sideman.com

## JURY DEMAND

Pursuant to Fed. R. Civ. Proc. 38 and Civil Local Rule 1.06(a), Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. hereby demand a trial by a jury on all issues herein so triable.

Dated: June 7, 2018

Respectfully submitted,

/s/ Richard S. Dellinger

Richard S. Dellinger, Esquire
Trial Counsel for Plaintiffs
Florida Bar No.: 179957
LOWNDES, DROSDICK, DOSTER,
　KANTOR & REED, P.A.
215 North Eola Drive
Orlando, Florida 32801
Telephone: (407) 843-4600
Facsimile (407) 843-4444
richard.dellinger@lowndes-law.com
tina.althoff@lowndes-law.com
litcontrol@lowndes-law.com

and

Richard J. Nelson, Esquire
*To be Admitted Pro Hac Vice*
California Bar No.: 141658
Anna P. Chang, Esquire
*To be Admitted Pro Hac Vice*
California Bar No.: 301468
SIDEMAN & BANCROFT, LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, California 94111-3711
Telephone: (415) 392-1960
Facsimile: (415) 392-0827
rnelson@sideman.com
achang@sideman.com